Thomas H. Newton, Judge
J.L.H. appeals a juvenile court adjudication on.a-motion to modify a prior order of disposition, finding that he would- have been found-guilty if tried as an adult of violating section 571.080 (transfer of a concealable' firearm without a permit).[2] J.L.H. contends that thé juvenile-1 court committed.reversible error when it denied a motion to suppress his statement to the police in response to custodial interrogation conducted in violation of section 211.059. We agree and reverse.
This appeal requires us to resolve an issue of first impression. We must decide whether the narrow public-safety exception recognized in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), to the obligation to give Miranda [3] warnings should be read by implication into section 211.059, a Missouri statute that expressly addresses a juvenile’s rights during custodial interrogations.[4]
Factual and Procedural Background
Based on a tip about an individual with a gun relayed by a parking attendant and security dispatcher at the Country Club *692 Plaza in Kansas City, Missouri, uniformed, off-duty police officers who were working as Plaza security began following J.L.H. in late April 2014. He stood . out’ from the group of young people he was with because he was wearing a yellow hoodie, which had been an identifying characteristic of the tip, and he began walking away from the group after he was spotted. When ordered to stop, J.L.H. began to run. He was apprehended after a chase that ended as he stopped and lay down at the bottom of a hill along Brush Creek in response to a command to show his hands. He was handcuffed, frisked, and liftéd onto а. retaining wall, and held ,by one of the officers. After about five .to eight minutes, he was walked up the hill from the creek surrounded by several officers and was asked where he threw , the gun. Before asking the question, the officers did not provide the warnings to J.L.H., who was known to one of them, as required under Miranda[5] and section 211.059.1, including his right to remain silent and the consequences of making an incriminating statement.[6]
Searching for the weapon, other officers who had been canvassing the area, found a handgun in a bush where J.L.H. said he had thrown it. Officer William Thompson who actually found the gun, a semi-automatic, .40 caliber Glock pistol with six live rounds, testified during the adjudication hearing that he knew to look for it in a bush along Brush Creek because he was “doing an area canvass, just looking everywhere.” [7] _
The juvenile officer filed a motion to modify, alleging that J.L.H. “violated Section 571.080 RSMo by knowingly possessing, in Jackson County, Missouri, a concealable handgun, a Smith and Wesson [sic] Glock Pistol and by possessing, in Jackson County, Missouri, ammunition that is suitable for use only in a handgun, approximately 6 live rounds loaded, in the Glock Pistol.”[8] J.L.H. filed a motion to suppress the statement to-the police about the' handgun’s location and orally amended the motion to specifically allege a violation of section 211.059. The police officers involved in the chase and search for the handgun testified to the facts set forth above during the suppression hearing. The juvenile court denied J.L.H.’s motion to suppress the statement about the handgun’s location, finding that'the “tip was not anonymous or unreliable, the stop was justified and the question asked of the juvenile does fall within the public safety exception.” J.L.H.’s statement to the police *693 was admitted over objection during the adjudication hearing. Following the adjudication hearing, the juvenile court sustained - the juvenile officer’s allegation, committed J.L.H. to the custody of the director-of Family Court Services, and suspended the commitment, placing J;L.H. in his grandmother’s custody where he had been since a 2009 disposition. Other than the statement that J.L.H. made about the handgun, no additional evidence had been introduced to prove that the recovered handgun had been in his possession. J.L.H. was fourteen years old when the custodial interrogation took place.
Legal Analysis
Custodial Interrogation of a Juvenile
In the first point, J.L.H. argues that the juvenile court committed reversible error when it overruled the motion to suppress his statement to officers and later admitted that statement over objection because his statement was obtained during a custodial interrogation that violated section 211.059. We review a trial court’s denial of a motion to suppress by considering both the suppression hearing and trial evidence “to determine whether sufficient evidence exists in the record to support the trial court’s ruling.” State v. Grayson, 336 S.W.3d 138, 142 (Mo. banc 2011). We defer to the trial court’s credibility determinations and factual findings, asking “only whether the decision is supported by substantial evidence.” Id. (internal quotation marks omitted). We reverse for clear error. Id. We review questions of law de novo. State v. Werner, 9 S.W.3d 590, 595 (Mo. banc 2000).
Section 211.059 provides: •
Rights of children when taken into custody (Miranda warnings).—
1. When a child is taken into custody by a juvenile officer or law enforcement official, with or without a warrant for an offense in violation of the juvenile code or the general law which would place the child under the jurisdiction of the juvenile court ..., the child shall be advised prior to questioning: '
(1) That he has the right to remain silent; and ■
(2) That any statement he does make ' to anyone can be and may be used against him; and
(3) That he has the right to have a parent, guardian or custodian present during questioning; and
(4) That he has a right to consult with an attorney and that one will be appointed and paid for him if he cannot afford one.
2. If the child indicates in any manner and at any stage of questioning pursuant to this section that he does not wish to be questioned further, the officer shall cease questioning.
The State has not contested that J.L.H. was not given the warnings specified in section 211.059.1 before making statements concerning the handgun’s location. The State argues, however, that the statutory warnings were not required, because the circumstances fell within the scope of the “public safety” exception recognized in New York v. Quarles, .467 U.S. .649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We reject the State’s contention that we can read an unstated “public safety” exception into the mandatory provisions of section 211.059.1.[9]
*694 In Quarles, an adult defendant arrested on suspicion of rape was not Miran-dized before he was asked to reveal the location of a handgun after he was handcuffed and in custody.[10] .467 U.S. at 652, 104 S.Ct. 2626. The Court recognized that the “Fifth Amendment guarantees that ‘[n]o person ... shall be compelled in any criminal case to be a witness against himself.”’ Id. at 654, 104 S.Ct. 2626. The Court, recognized that Miranda “extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police.” Id. The Court also recognized that “[rjequiring Miranda warnings before custodial interrogation provides ‘practical reinforcement’ for the Fifth Amendment right.” Id. (quoting Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d .182 (1974)). In short, “the prophylactic Miranda warnings therefore are ‘not themselves rights protected by the Constitution.’” Id. (quoting Tucker, 417 U.S. at 444, 94 S.Ct. 2357). Based on this analysis, the Court ruled that “the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege against self-incrimination.” Id. at 657, 104 S.Ct. 2626. As such, the Court recognized “a ‘public safety’ exception to the requirement that Miranda warnings be given before a suspect’s answers may be admitted into evidence.” Id. at 655, 104 S.Ct; 2626. The effect of the exception is to qualify when Miranda warnings must be given.
Although Quarles recognized a public-safety exception as a matter of constitutional law, section 211.059 must be interpreted independently of federal constitutional decisions. It is well-established that the General Assembly has the authority to provide greater protections than the federal constitution requires. See, e.g., State ex rel. J.D.S. v. Edwards, 574 S.W.2d 405, 409-10 (Mo. banc 1978). Plainly, the General Assembly did just that, and purposefully so, when it enacted section 211.059. Section 211.Ó59 independently addresses important rights that the General Assembly desired to afford, juveniles, notwithstanding that those rights have parallel constitutional origins. In at least one important respect, section 211.059 gives broader rights to juveniles during custodial interrogations than the rights given under Miranda and its progeny: under subsection 211.059.1(3), a juvenile must be advised “[t]hat he 'has the right to have a parent, guardian or custodian present during questioning.” Miranda and its *695 progeny do not require such a' warning. Indeed, in requiring that juveniles be advised that they have a right-to have*an adult present during questioning, the General Assembly rejected the approach taken by the Missouri .Supreme Court in In re A.D.R., 608 S.W.2d 575 (Mo. banc 1980). A.D.R. abrogated In re K.W.B., 500 S.W.2d 275, 288 (Mo.App. 1973), where the court of appeals held that constitutional principles require a juvenile in custody to “be given an opportunity to consult with his parents, guardian, adult friend, or attorney as to whether he wishes to waive [his] rights.” Obviously, section 211.059 expressly affords juveniles those very rights, deemed lacking as a matter of constitutional law by In re A.D.R. This demonstrates that, in enacting section 211.059, the General Assembly recognized that the Juvenile Code permissibly operates independently of constitutional protections (so long as not more restrictive than constitutional protections).
In closely related contexts, the Missouri Supreme Court has recognized that the Juvenile Code, operates independently from federal constitutional principles, even when the code and the constitution address the same issues.. Thus, in State, v. Arbeiter, 408 S.W.2d 26 (Mo.1966), the Missouri Supreme Court considered whether a juvenile’s rights had been violated when the juvenile was interrogated for an extended period of time without being promptly turned over to juvenile authorities or advised of his right to counsel. The supreme court did not rely on Gallegos v. State of Colorado, 370 U.S. 49, 55, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), a federal constitutional-law decision, to find reversible error, but instead relied solely on the failure to strictly and literally comply with section 211.061, a provision that requires juveniles to be brought promptly before the juvenile court for a detention hearing during which the juvenile and his or her custodian or parent are to be advised of the juvenile’s right to counsel. Arbeiter, 408 S.W.2d at 31. Our supreme court observed that, because it had found a violation of statutory protections afforded the juvenile under the Juvenile Code, “we do not reach the formidable constitutional objections to the use of the defendant’s statements in this case.” Id.- (citing Gallegos, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325).
In In re Gault, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the U.S. Supreme Court held that “the Due Process Clause of the Fourteenth Amendment” affords juveniles in “delinquency proceedings which might result in commitment to an institution” the right to be represented by counsel. When Gault was decided, however, the Missouri General Assembly had already adopted section 211.211[11] similarly affording juveniles the right to counsel. After Gault, when our supreme court considered a juvenile’s right to counsel in In re D.J.M., 259 S.W.3d 533 (Mo. banc 2008),’ the court did not rely on Gault to find reversible error, but instead relied solely on the trial court’s failure to strictly and literally, comply with section 211.211. Id. at 536. Our supreme court observed that it did not need to address D.J.M.’s constitutional right to counsel, “because D.J.M. was not provided his statutory right to . counsel pursuant to section 211.211.” Id.; see also State v. Burris, 32 S.W.3d 583, 589 (Mo.App.S.D.2000) (“The right of a child to be advised that he or she has a right to have a parent, guardian or custodian present during questioning is derived from § 211.059.1(3), a statutory provision that is part of this state’s juvenile code, rather than from the' Miranda inter *696 pretation of a suspect’s constitutional rights.”). .
We are required, therefore, to view and apply section 211.059'distinctly from its constitutional counterpart, just as the-Missouri Supreme Court did - with respect to sections 211.061 and 211.211 in Arbeiter and D.J.M.- Accepting that premise leads to the inescapable , realization that ¡the General Assembly enacted section 211.059 because it intended to define a juvenile’s rights in advance of custodial interrogations by statute, independently of constitutional'protections. Indeed, though section 211.059 includes' required warnings similar to Miranda, ‘it also includes the right to have a parent, guardian, or custodian present during any custodial interrogation. . J.LJEL’s first point presents a question of statutory interpretation,- not a question of constitutional law. While the U.S. Supreme Court may-have repognized a “public safety” exception to the warnings required by Miranda, the question we address is different: is there a public-safety exception to the warnings required by section 211.059? The answer to this latter question is plainly “no.”.:
Section* 211.059 does ■ not; in express terms, include -a “public safety” exception. Instead, the statute states, in mandatory terms and without qualification, that “[w]hen a child is taken into custody by a juvenile officer or law enforcement official ... for an offense in violation of the juvenile code or the general law[,] ... the child shall be advised [of the specified rights] prior to questioning....” (Emphasis added.) Under bedrock principles of statutory construction, we cannot-incorporate unwritten conditions, exceptions, ¡ or limitations into section 211.059’s unambiguous command. The. Missouri Supreme Court has emphasized that “‘[t]his Court may not engraft upon the statute provisions which do not appear in explicit words or by implication from othe[r] words in the statute.’” State v. Collins, 328 S.W.3d 705, 709 n. 6 (Mo. banc 2011). Courts “cannot supply what the legislature has omitted from- controlling statutes”; instead, we -“enforce[ ] statutes as ■ they are written, -not as they might have been written.” Turner v. Sch. Dist. of Clayton, 318 S.W.3d 660, 668 (Mo. banc 2010). Under these fundamental principles, “ [wjhere no exceptions are made in terms, none will be made by mere implication or construction.” McGhee v. W.R. Grace & Co., 312 S.W.3d 447, 455 (Mo.App.S.D.2010) (citations omitted).
In addition, the General Assembly “is presumed to have acted with a full awareness and complete knowledge of the present státe of the law, including judicial and legislative precedent.” State ex rel. Pub. Counsel v. Pub. Serv. Comm’n, 259 S.W.3d 23, 31 (Mo.App.W.D.2008); see also. Turner, 318 S.W.3d at 668. Section 211.059 was enacted five years after Quarles was decided. We must presume, therefore, that the General Assembly was aware of the existence of the public-safety exception to the obligation to give Miranda warnings when it enacted section 211.059. Yet it did hot include a public-safety exception in the statute.
Finally, in construing legislation, we presume that the Legislature does not enact laws without, a reason. “ ‘[T]he legislature will not be charged with haying done a meaningless act.’ ” Stiers v. Dir. of Revenue, 477 S.W.3d 611, 617 (Mo. banc 2016) (quoting State v. Swoboda, 658 S.W.24 24, 26 (Mo. banc 1983)). Before' section 211,059 was enacted, the U.S. Supreme Court had declared in Gault that “the [Fifth Amendment] constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults.” 387 U.S. at 55, 87 S.Ct. 1428. By then, Mvranda had already been *697 decided.[12] Yet, in 1989, twenty-two years after Gault, our General Assembly enacted section 211.059. Section 211.059 requires warnings similar to — but broader than— those required under Miranda and Gault. Codification of a juvenile’s right to receive Miranda warnings, however, would have been an unnecessary- act, if the State is correct that section 211.059 codified- the entirety of the U.S. Supreme Court’s Miranda jurisprudence.
We accordingly conclude that law enforcement officers were required to give J.L.H. the warnings specified in section 211.059 before engaging him'in a custodial interrogation; the statutory requirement that these warnings be given is not excused, even if the circumstances fell within Quarles’ “public safety” exception.
Missouri courts have not previously addressed the consequence should, a statement be elicited from a, juvenile in violation of section 211.059. The Missouri Supreme Court has, however, concluded that violations of similar Juvenile Code provisions constitute reversible error.
In State v. Arbeiter,, 408 S.W.2d 26, 29 (Mo.1966), a juvenile accused of first-degree murder was interrogated in violation of section 211.061, which required that a juvenile, once taken into custody, be taken “immediately and directly before the juvenile court,” or be delivered “to the juvenile officer or person acting for him.” Having determined that a statutory violation occurred, the Missouri Supreme Court observed that “[t]he question remains as to the effect of noncompliance with section 211.061.” Id. The court held that “the absence of express statutory sanction against police procedures in violation of the Juvenile Code does not require that such violations be excused or ignored.” Id. The court examined the rationale the Arizona Supreme Court employed to address violations of a similar “right ta counsel” statute. Id. at 29-30 (citing State v. Shaw, 93 Ariz. 40, 378 P.2d 487 (Ariz. banc 1963)). Though lengthy, that’rationale-is'instructive and is set forth in full:
The philosophy which inspired creation of the juvenile court, and statutes implementing it, is that the state recognizes that in the majority of cases involving antisocial behavior (including criminal offenses) on the part of the youthful offenders, there is both a responsibility and an opportunity for the state, through special treatment in a non-criminal proceeding, to redirect and rehabilitate these young people. This operates for the benefit of the individual, and for society as a whole. However, in many states, as in Arizona, it is also recognized that there are certain individuals still within the chronological classifica- ' tibn as juveniles, for whom this special treatment is futile. The juvenile court therefore may refuse to continue its jurisdiction in such cases, and may remand these individuals for regular proceedings in the criminal court. Under the law in Arizona, until the juvenile court, which has exclusive jurisdiction of all delinquent; children or children accused of crime, has considered- the matter and decided that the- particular individual is not one who will benefit from its special treatment, _ a child offender remains in the juvenile jurisdiction. While under the juvenile court jurisdiction, a child is under certain disabilities not attaching to an adult. He is not entitled to be released on bail; he does not have the .right of .trial by jury, or right of compulsory process to compel the attendance of witnesses on his behalf guaranteed by the Arizona Constitution in criminal prosecutions. To compen *698 sate for some of these disabilities, the juvenile statutes provide that the juvenile probation officer shall act as a representative in his behalf, and further that if he is arrested by a peace officer, such officer ‘shall forthwith notify the probation officer, and shall make such disposition of the juvenile as the probation officer directs.’
The need for special treatment begins at thé instant the juvenile is contacted by peace officers and this was recognized by the legislature. A few hours of the treatment sometimes accorded mature and hardened criminals can give the impressionable mind of a youth an indelibly warped view of society and its interest in him.
Unquestionably, the purpose of A.R.S. [section] 8 — 221 was to alter the usual method of handling persons arrested on suspicion or for investigation of criminal activities when those persons are juveniles. Moreover, it is apparent that this alteration of methods was intended to protect the interests of juveniles rather than to facilitate police investigations. Since a major feature of the usual treatment of newly arrested persons is interrogation, it follows that one of the purposes of A.R.S. [section] 8 — 221 is to protect the juvenile from the adverse effects of this procedure.
We have carefully considered the possible means of enforcing the policy expressed in A.R.S. '[section] 8 — 221 and have concluded that the means most in harmony with the purposes expressed and implicit in that section is to preclude the admission of statements obtained by the persuasion of police during the period when the section is being violated.
Id. at 30 (quoting Shaw, 378.P.2d at 491-93).
The Missouri Supreme Court adopted the Arizona Supreme Court’s rationale in its entirety:
In our opinion, this conclusion is entirely consistent with the philosophy ■ of our Juvenile Code. While we recognize the interest of society in the protection of its members against criminal activity, the Juvenile Code recognizes that at the juvenile level, the problem is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child. If our experience shows that the special procedures for the benefit of juveniles are producing results adverse to the best interests of society, then the legislative authority may resort to different procedures. In the meantime we feel obligated to construe and apply the Juvenile Code as the Arizona court did, ‘to protect the interests of juveniles rather than to facilitate police investigations.’
Id. at 30-31. Our supreme court then concluded that the statement elicited from the juvenile in violation of section 211.061 was inádmis'sible, requiring reversal and remand of the case for a new trial.[13] Id. at 31.
In State v. Wade, 531 S.W.2d 726, 728-29 (Mo. banc 1976), the Missouri Supreme Court reiterated the holding that failure to strictly and literally comply with section 211.061 constitutes reversible error. The court stated, “The Juvenile Code intends that no statement shall be made to police by a person [younger than] seventeen years of age before the child is taken to juvenile authorities. To hold the statement admissible here would permit the State to obtain and use what the Code *699 refuses.” Id. at 729. Acknowledging the incapacities of juveniles, 'the court determined that the Juvenile Code: ,. ■
recognizes the incapacities of persons [younger than] seventeen years of age, and intends that a child shall be provided with the assistance of a juvenile officer or other juvenile court personnel before he is subjected to the rigors of police interrogation. We doubt the capacity of an offender [younger than] seventeen years of age to legally effect a waiver of any kind in the absence of such a person.
Id. at 728-29,[14]
■ The Missouri Supreme Court used an identical rationale in In re D.J.M., 259 S.W.3d 533 (Mo. banc 2008), a case addressing the violation of á juvenile’s statutory right to the counsel as provided, in section 211.211. As with section 211.061, section 211.211 does not express a consequence for its violation. The supreme court observed that, “[b]ecause of the importance of the right to counsel to the fairness of the proceedings [for a juvenile], there must be strict and literal compliance with the statutes affecting this right, and failure to strictly .comply results in reversible error.” Id. at 535 (citing In re C.W., 211 S.W.3d 93, 97-98 (Mo. banc 2007) (holding that trial court’s .failure to strictly comply with section 211.455, requiring the submission of an investigation and' social study after juvenile petition, was reversible error), abrogated on other grounds by In re B.H., 348 S.W.3d 770 (Mo. banc 2011)). Thus, the supreme court held that, because “[t]he trial court did not strictly comply with section 211.211 when it failed to appoint counsellor D.J.M. without a full record supporting waiver of his right to counsel or. representation of.D.J.M. by other counsel in the case who was not subject to a conflict of interest^] ... [the] noncompliance results in reversible error.” Id. at 536. The court reversed the juvenile’s conviction. Id.
Here, the State has not contested that J.L.H.’s statement was elicited during a custodial interrogation which was not preceded by -the* section 211.059 warnings. Section 211.059 requires a juvenile to be notified of his right to counsel, similar to section 211.211. Section 211.059 prohibits interrogations of a juvenile without advising the juvenile of the right to have a parent, guardian, or custodian present. See Wade, 531 S.W.2d at 729 (expressing doubt that a juvenile offender can “legally effect a waiver of any kind in the absence of. the assistance of a juvenile officer). The important protections afforded by sections 211.061 and 211.211 are qualitatively indistinguishable from the protections provided juvenile offenders by section 211.059. The rationale that the Missouri Supreme Court so carefully examined-and explained in Arbeiter, Wade, and D.J.M. with respect to the consequence' of failing to strictly and literally comply with the Juvenile Code’s provisions is equally applicable here. Thus, though section 211.059 does not express a consequence for its violation, analogous Missouri Supreme Court precedent directs that the failure to strictly and literally comply with section 211.059 rendered J.L.H.’s statement inadmissible.[15] The ju *700 venile court’s denial of J.L.H.’s motion to suppress his statement to authorities during an unlawful custodial interrogation, and the juvenile court’s subsequent- admission of the statement during J;L.H.’s adjudication hearing over J.L.H.’s objection, constitute reversible error.[16] ' ' ■
When section 211.059 was enacted, the General Assembly was aware of the Missouri Supreme Court’s compelling analysis in Arbeiter and Wade ascribing" to the General Assembly a particular rationale in adopting the Juvenile Code. When section 211.059 was enacted, the General Assem *701 bly was aware of the-consequences our supreme court had imposed in Arbeiter and Wade for failure to strictly and literally comply with Juvenile Code provisions affording important protections to juveniles. When section 211.059 was enacted, the General Assembly was aware that Ar-beiter acknowledged and honored the distinct origin of statutory protections afforded juveniles while expressly declining to address comparable constitutional protections. Against this backdrop, the General Assembly would necessarily have appreciated that in enacting section 211.059, the rights therein afforded juveniles would be determined independently of parallel constitutional rights and that a failure to strictly and literally abide by section 211.059 would constitute reversible error. Thus, we are required to view the General Assembly’s failure to include an express public-safety exception in section 211.059 as a purposeful omission. “[W]e must interpret and apply [section 211.059] as written_' It is not our prerogative to question the wisdom of the legislature in enacting” the statute without a public-safety exception. In re KC.M., 85 S.W.3d 682, 694 (Mo.App.W.D.2002) (citations omitted), abrogated on other grounds by In re M.D.R., 124 S.W.3d 469 (Mo. banc 2004).
Our conclusion is further reinforced by the fact that when section 211.059 was enacted, the General Assembly knew; that Arbeiter -addressed the precise tension which now underscores the State’s request to imply a public-safety exception. In Ar-beiter, . the Missouri Supreme Court resolved the tension between public safety and the special procedures that the Legislature had adopted to benefit juveniles in favor of protecting juveniles. As noted above, the supreme court stated:
While' we recognize the interest of society in the protection of its members against criminal activity, the Juvenile Code recognizes that at the juvenile level, the problem is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child. If our experience shows that the special procedures for the benefit of juveniles are producing results adverse to the best interests of society, then the legislative authority may resort to different procedures. In the meantime, wé feel obligated to construe and apply the Juvenile Code as the Arizona court did, “to protect the interests of juveniles rather than to facilitate police investigations.”
Arbeiter, 408 S.W.2d at 30-31 (emphasis added). We cannot disregard that, despite knowledge that its Juvenile Code provisions would be interpreted to resolve public-safety concerns in favor.of protections afforded juveniles, the General Assembly did not include a public-safety exception when it enacted section 211.059. --
In summary, we conclude that the General Assembly knew when it enacted section 211.059 that a statement obtained from a juvenile in violation of section 211.59 would result in reversible error if admitted into evidence over proper objection. We necessarily conclude, therefore, that the General Assembly’s failure to express a public-safety exception in section 211.059 was purposeful. We will not rewrite a plain and unambiguous statute to imply an unexpressed term. Jackson y. Wilson, 581 S.W.2d 39, 44 (Mo.App.W.D. 1979) (holding that court should abstain from “rewriting a statute under the guise of construing it”).[17]
*702 Therefore, we reject the State’s argument that its admitted- violation of section 211.59 should be excused by the public-safety exception. Section 211.059 warnings and advisements are mandatory, and statements secured from a juvenile in violation of the statute will result in reversible error if admitted into evidence. J.L.H.’s statement to the police during a custodial interrogation, and in violation of section 211.059, was inadmissible. The juvenile court committed reversible error by failing to sustain J.L.H.’s motion to suppress the statement and by admitting the statement into evidence over objection during J.L.H.’s adjudication hearing. Because J.L.H. self-incriminatory statement was the only evidence introduced to prove an essential element of the juvenile officer’s allegation, J.L.H.’s adjudication and disposition must be reversed. See State v. Larson, 623 S.W.2d 69, 73 (Mo.App.W.D. 1981) (court reversed juvenile’s conviction of possession of nonintoxicating beer by a minor because sheriff who had him in custody did not give him full Miranda warnings before asking him his age and minor’s answer was the only evidence presented to prove an essential element of the crime).
Our conclusion recognizes the perils that the Juvenile Code is intended to protect against — that children are particularly vulnerable to the coercive effects of police custody. We would be tilting the delicate separation-of-powers balance by reading an unexpressed public-safety exception into section 211.059.[18] That would amount to legislating rather than adjudging, which “we are forbidden to do.” State v. Jones, 172 S.W.3d 448, 457 (Mo.App.W.D.2005), *703 overruled on other grounds by State v. Claycomb, 470 S.W.3d 358 (Mo. banc 2015). If the General Assembly wishes to change section 211.059, it is free to do so. Arbeiter, 408 S.W.2d at 30-31. In the meantime, law enforcement motivated by exigent public-safety concerns remain free to act on those concerns by making urgent inquiry of a juvenile in custody. If, however, a statement secured from a juvenile in the process violates section 211.059, the statement will not be admissible in a subsequent criminal proceeding involving the juvenile. Id. That resolution is wholly consistent with the Juvenile Code’s purpose.
J.L.H.’s first point on'appeal is granted. Because we reverse the adjudication, we do not address his remaining points, whether the statement was inadmissible because the police lacked probable cause to place him in custody or whether the State introduced sufficient' evidence to prove J.L.H.’s age.
Conclusion
We reverse the juvenile court’s adjudication and disposition, finding that it erred in overruling J.L.H.’s motion to suppress.
Thomas H. Newton, Judge, writes for . the majority.
Alok Ahuja, Chief Judge, Lisa White Hardwick, Cynthia L. Martin, Gary D. Witt, Judges, and Joseph M. Ellis, Senior Judge, concur. Alok Ahuja, Chief Judge, writes in a separate concurring opinion. Cynthia L. Martin, Judge, concurs.
Mark D. Pfeiffer, Judge, writes for the dissent. Victor C. Howard, James E. Welsh, Karen King Mitchell, and Anthony Rex Gabbert, Judges concur.

. Statutory references are to RSMo (2000), as updated by cumulative supplement, unless otherwise indicated,

. Miranda v. Ariz., 384 U.S. 436, 86 S'.Ct. 1602, 16 L.Ed.2d 694 (1966).

.In this regard, we emphasize that our decision is wholly based on the need to discern legislative intent "in the absence of statutory text incorporating constitutional jurisprudence or the public-safety excéption.'To the extent that the dissent focuses.on constitutional precepts as well as principles derived from search-and-seizure case law, we suggest that analysis should not be followed.

.The constitutional right to which the Miranda warnings apply was extended to juveniles under In re Gault, 387 U.S. 1,' 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

. Whether J.L.H. was in custody when he was a§ked where he threw the gun is not in disr pute. He had been handcuffed and was surrounded by several officers when questioned.

.The juvenile officer argues that,"[i]t was not until J.L.H, told Officer Hill where the gym was located that Officer Thompson recovered the gun in the bushes” and directs the court to the testimony of Sergeant Pegg, who was Officer Thompson’s partner that evening. Sergeant Pegg stated that they had found the gun by backtracking the foot pursuit, not because they found it where J.L.H. said he had thrown it. In this regard, he testified:
I knew that a gun had been found. My partner had found a gun in a bush along the line. We, basically, what we do in any foot pursuit is we always backtrack and kind of walk back the route that we ran to see if anybody — you know, if they dropped anything-. And he found a gun in a bush right by — right after — when you go down the hill, right as you go down the hill and you start to head west towards the water, it was right there in the first bush, so—

.Smith and Wesson and Glock are separate firearms manufacturers. The record is not entirely clear as to. which mánufacturer produced the weapon in this case.

. The State’s argument assumes that the U.S. Supreme Court would hold that the Quarles’s public-safety exception applies wholesale to the interrogation of juveniles. The State's and dissent’s confident assumption that Quarles would be applied to juveniles without qualification may be open to question. Op, at 708. The U.S. Supreme Court has consistently dis *694 tinguished between adults and juveniles in addressing constitutional rights and protections, recognizing that juveniles are, simply stated, different from adults. See, e.g., (J.D.B. v. N. Carolina, 564 U.S. 261, 131 S.Ct. 2394, 2404, 180 L.Ed.2d 310 (2011) (summarizing the concerns addressed by the U.S. Supreme Court since the mid-1900s about a juvenile’s limited capacity to exercise mature judgment, and elaborating on a " ‘history [that] is replete with laws and judicial recognition’ that children cannot be viewed simply as miniature adults”) (citation omitted)). Similar observations about the different capacities of juveniles subject to questioning while in custody appear even earlier in In re Gault, 387 U.S. 1, 44-55, 87 S.Ct. 1428,' 18 L.Ed.2d 527 (1967).
Because we conclude that statutory protections afforded juveniles by the Juvenile Code are to be applied and interpreted independently of constitutional counterparts, and'because we conclude that the Quarles’s public-safety exception cannot be read by implication into section 211.059 based on settled principles of statutory construction, we need not resolve the question whether Quarles even applies to juvenile custodial interrogations.

. The victim in Quarles had reported to police that her rapist had a gun and had entered a nearby supermarket before being apprehended. 467 U.S. at 651-52; 104 S.Ct 2626.

. Section 211.211 was first enacted in 1957.

. The U.S. Supreme Court decided Miranda in 1966.

. A new trial was ordered because the Supreme Court ‘‘[could] not conclude on the record ... that it would be impossible for the prosecution to make a submissible case against the appellant without the use of his statements.” Arbeiter, 408 S.W.2d at 31.

. As part of its argument that Fourth Amendment exclusionary rule principles should apply here, the dissent argues that police officers should not be required to ascertain a suspect’s age before questioning. .In this regard the dissent states, ‘‘[T]here is nothing in the record indicating that Sergeant Williams knew that J.L.H. was a juvenile.” Op. at 713. Yet, in State v. Wade, 531 S.W.2d 726, 729 (Mo. banc 1976), our supreme court held that statements obtained in violation of section 211.061 should have been excluded even though the juvenile had misrepresented his age.

. The dissent argues that “[h]ad the legislature wished to expressly exclude the usage *700 of statements obtained in violation of’section 211.059, it could have dope so,” relying on section 211.271.3, Op. at 710 n.6. That statute does" not aid the dissent; it establishes that statements a child makes-to a juvenile officer after the child is taken into custody '“are .not lawful or, proper evidence against the child and shall not be used for any purpose whatsoever in "any proceeding, civil or criminal, other than proceedings' under this chapter." § 211.271.3 (emphasis added). The statute does not "exclude” a juvenile's statements in juvenile proceedings — it expressly authorizes their" use in such proceedings. More to the point, unlike sections 211.059, 211.061, and 211.211, section 211.27-1.3 does not describe procedures that must be followed in juvenile matters to protect the juvenile’s rights. Instead, section 211.271 addresses the effect of juvenile court proceedings on a juvenile’s civil rights" in other contexts and cases. It is in this context that the state precludes the use of the statements a juvenile makes to a juvenile officer against the juvenile in proceedings other than those-pursued under the Juvenile Code. In so providing, the Legislature did not prescribe a “remedy” or,"consequence” for a section 211.271 violation.
We would also note that a similar argument was made and expressly rejected in Arbeiter. After recognizing that section 211.271.3 was literally not applicable to the case, our supreme, court still held.that exclusion of the statement obtained in violation of section 211.061 was appropriate. 408 S.W.2d at 29. It was in this context that the court stated, "[T]he absence of express statutory sanction against police procedures in violation of the Juvenile Code does not require that such violations be excused or ignored.” Id.

. The dissent, for the sake of argument, "ac- , cepts that J.L.H.’s rights were violated under section 21Í.059,” Op. at 710, but argues that those rights should be subject to the judicially created exclusionary rule, and thus to an analysis of "whether the purposes of the exclusionary rule would be served by applying it to statements obtained from juveniles in viola- • tion of section’ 211.059.” Op. at 712. This argument ignores, the critical fact that we are not addressing a constitutional violation in this case. We are addressing a statutory violation. The dissent cites no authority for applying the exclusionary rule to determine the consequences of a statutory violation merely because the statute affords rights that parallel or exceed constitutional rights. In fact, in McNabb v. U.S., 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the case the dissent relies on to suggest that the exclusionary rule applies to Fifth Amendment violations, op. at 7-10-11, the-U.S. Supreme Court expressly held that because Congress had enacted a statute addressing interrogations, it need not “reach the Constitutional issue pressed upon us.” Instead, the U.S. Supreme Court concluded that "[qjuite apart from the Constitution, we are constrained to hold that the evidence elicited from the petitioners ... must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them.” McNabb, 318 U.S. at 341-42, 63 S.Ct. 608. Importantly, using a rationale that is indistinguishable from that our supreme court used in Arbeiter, Wade, and In re D.J.M., the U.S. Supreme Court held:
Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in wilful disobedience of the law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.
Id. at 345, 63 S.Ct. 608' (emphasis added) (note that the U.S. Supreme Court recognized that Congress had subsequently acted to limit, but had not eliminated, the rule in McNabb in Corley v. U.S., 556 U.S. 303, 306, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009)).

. As for the other states that have adopted warnings in one form or another for juveniles caught up in delinquency proceedings, unlike in Missouri, at least six of the thirteen the dissent has identified saw fit to expressly incorporate a reference to the larger body of *702 constitutional jurisprudence. Op. at 714 n.9. For example, under a subsection titled "Rights of juveniles,” New Jersey law provides, "All rights guaranteed to criminal defendants by the Constitution of the United States and the Constitution of this State, except the right to criminal indictment, the right to trial by jury and the right to bail, shall be applicable to cases arising under this act." N.J, Rev. Stat. § 2A:4A-40 (1983). New Hampshire requires the court at any arraignment to "[ijnform the minor of the applicable constitutional rights.” N.H.Rev. Stat. Ann, § 169 — B:13 (2011). Washington requires that juveniles be advised of their rights when appearing in court and specifically states, "A juvenile shall be accorded the same privilege against self-incrimination as an adult. An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding may not be received in evidence at an adjudicatory hearing over objection.” Wash. Rev. Code § 13.40.140(8) (2014). And in Kansas and Montana, reference is expressly made to a youth's "right against self-incrimination” in the context of statements made while in custody. Kan. Stat. Ann. § 38— 2333(a) (2007); Mont. Code Ann. § 1-5-331(l)(a) (2009). There are any number of ways to expressly incorporate constitutional jurisprudence. Our Legislature chose not to do so.
What other states have concluded on the issue is not binding on this Court, and it is particularly telling that just thirteen have apparently adopted the warnings our Legislature adopted when it enacted section 211.059. This is clearly a matter of constituent preference and legislative deliberation rather than a wholesale adoption of more limited federal guarantees. The few state courts that have applied the public-safety exception to juveniles either have no comparable statutory protections or did so peremptorily, without considering how doing so fit within the juvenile justice statutory framework or whether it comported with legislative intent as we do here, See In re Cy R., 43 A.D.3d 267, 841 N,Y.S.2d 25, 28 (2007) (ruling that inquiry about location of weapons fell within Miranda's public-safety exception, without acknowledging or addressing statutory warnings that do not expressly include it), cert, .denied, 552 U.S. 1320, 128 S.Ct. 1891, 170 L.Ed,2d 762 (2008).

. We remind that whether the Quarles public-safety exception will be interpreted to apply to juveniles remains an unresolved constitutional question, contrary to the dissent’s assertion. See footnote 8 above.