

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION TWO</u>

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M. | ) | No. ED107379 |
| | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| | ) | Cause No. 1822-JU00455 |
| | ) | |
| | ) | Honorable Robin Ransom |
| | ) | |
| | ) | Filed: October 1, 2019 |

## **OPINION**

J.M. appeals the judgment of the Juvenile Division of the City of St. Louis Circuit Court convicting him of unlawful use of a weapon, pursuant to Section 571.030.1(10) RSMo (2016). [1] We affirm.

## **BACKGROUND**

On August 31, 2018, J.M. was a student at Lift for Life Academy ("Academy") when the principal, Dr. David Lemay ("Dr. Lemay"), searched his bag and discovered a handgun. The Juvenile Officer charged J.M. with one count of unlawful use of a weapon, alleging that on or about August 31, 2018, J.M. knowingly carried a firearm into a school in violation of Section 571.030.1(10). On September 26, 2016, J.M. filed a motion to suppress "any and all articles

---

[1] All further statutory references are to RSMo (2016).

seized and intend[ed] to be used against [J.M.], and any testimony regarding such evidence" alleging it was obtained as a result of an unlawful search and seizure in violation of his Fourth and Fourteenth Amendment rights. At trial, on October 1, 2018, the court adjudicated both the motion to suppress and the Juvenile Officer's allegations against J.M.

J.M. was participating in Academy's long-term on-site suspension program, Success Academy ("Success"), for possession of drug paraphernalia. As a suspended student, J.M. was permitted to be on Academy's premises during the regularly scheduled hours for Success, but was otherwise forbidden to "be on any academy property or attend any [Academy] function whether on or off campus during the period of suspensions" unless authorized to do so by Academy's principal or director. Consequently, on August 31, 2018, J.M. was dismissed at noon and was required to immediately leave campus.

The Juvenile Officer presented the testimony of Chandra Palmer ("Palmer"), dean of students at Academy, Ariel Turner ("Turner"), assistant dean at Academy, and Dr. Lemay. All three witnesses consistently testified about the events giving rise to the search.

Palmer testified she saw three students waiting for Dr. Lemay to give them their bus tickets. Palmer ensured the students received their bus tickets, and requested they leave the building.[2] Shortly thereafter, Turner was transitioning students from lunch to class, when she saw J.M. with another student, J.J., outside of the front entrance. She saw J.J. throw "his arm to his side as if he was trying to hide something in his pocket." It appeared to Turner that both students were communicating with someone in the English classroom. Turner informed Palmer that "something was going on" because both J.M. and J.J. were still on campus. Specifically,

---

[2] J.M. disputes this testimony because Turner and Dr. Lemay could not recall if J.M. had his bus ticket. However, Turner testified it was standard procedure for students to receive their bus tickets at noon and Dr. Lemay, in debriefing with another administrator, confirmed that all students were provided with bus passes.

Palmer testified Turner told her that she observed J.J.'s and J.M.'s behavior and suspected they were possibly attempting to exchange drug paraphernalia with other students in the building. Palmer returned to the front door and saw J.J and J.M. communicating with someone in the building. She once again demanded they leave campus. Palmer returned to her office; however, when she came out moments later, she saw both J.M. and J.J. continuing to attempt to communicate with someone up the stairs. At this point, Palmer agreed with Turner's assessment of the students' conduct and she focused on "stopping them or trying to prevent them from doing something." Palmer believed Academy's school officials had reasonable suspicion to search J.M. due to his unauthorized presence after the dismissal of Success, his refusal to leave despite multiple requests, his suspicious behavior with J.J., and his record for previous possession of drug paraphernalia on school grounds.[3] Palmer decided to bring both students to the main office to see Dr. Noble.[4]

A search of the students was conducted in the presence of Dr. Noble and Dr. Lemay. J.J. was searched without issue; however, J.M. became resistant and an argument ensued. At some point, Dr. Lemay recalled Dr. Noble telling J.M., "[i]f you don't calm down, we're contacting the police." The arguments between J.M. and the administrators continued to escalate and when Dr. Noble again stated he was contacting the police, J.M. stated, "[y]ou can call the police. You can call the police[.]" However, when the call was actually placed, J.M. replied, "[w]ell, you didn't even have to call the police. You can just search it. You can search it." J.M. gave Dr. Lemay his bag, in which he discovered a small handgun.

---

[3] Palmer also testified that, prior to the underlying search, J.M. had come to school smelling like marijuana. He was brought to Dr. Lemay's office and searched, which revealed he was carrying a bong commonly used to smoke marijuana and some cigarillos.

[4] Dr. Noble's position at Academy was not provided in the record.

J.M. testified in his defense. He recounted that after being dismissed from Success he waited outside for his bus pass for about an hour while Dr. Lemay was on the phone. He claimed he only communicated with the other two students who were also waiting for their bus passes. He denied that Palmer asked him to leave the premises, and the first time he spoke with her was when she requested they all report to Dr. Noble's office.

J.M.'s counsel called J.J. as a witness and the Juvenile Officer objected due to the late endorsement of the witness. The Juvenile Officer filed a request for disclosure on September 10, 2018; however, J.M. filed his endorsement of the witness on September 29, 2018—five days after the due date. The objection was sustained. An offer of proof was made regarding J.J.'s testimony. J.J. testified that after being dismissed, he, J.M., and another student walked over to the building where Dr. Lemay's office was located to receive their bus passes. Dr. Lemay told the students to wait for him out front. He denied Palmer asked them to leave the premises and stated they waited at the front entrance until Palmer asked the students to come inside to Dr. Noble's office. Once there, they were told they were going to be searched.

After all of the evidence was presented, the parties argued J.M.'s motion to suppress. The motion to suppress and J.M.'s motion for judgment of acquittal were denied. The juvenile court entered its judgment finding the juvenile officer had proven beyond a reasonable doubt that J.M. committed the offense of unlawful use of a weapon and placed him on official court supervision in the care, custody and control of his mother.

This appeal follows.

## DISCUSSION

J.M. submits two points on appeal. In his first point on appeal, J.M. contends the juvenile court clearly erred in denying his motion to suppress evidence regarding the search of J.M.'s bag,

4

the seizure of the handgun, and any testimony concerning such evidence, because the search was not based upon individualized reasonable suspicion, and any consent was not voluntarily given.

In his second point, J.M. argues the juvenile court abused its discretion in sustaining the Juvenile Officer's objection to J.M.'s offer of proof and excluding all testimony from J.J., because the endorsement of J.J. as a witness was only five days late. J.M. also contends that he was prejudiced because J.J's testimony was relevant and material to J.M.'s defense.

## Standard of Review

Our court reviews juvenile proceedings in the same manner as other court-tried cases. *C.L.B. v. Juvenile Officer*, 22 S.W.3d 233, 235–36 (Mo. App. W.D. 2000). Our court will not disturb the judgment below unless it is against the weight of the evidence, erroneously declares the law, or erroneously applies the law. *Id.* at 236. "We review a trial court's denial of a motion to suppress by considering both the suppression hearing and trial evidence 'to determine whether sufficient evidence exists in the record to support the trial court's ruling.'" *In Interest of J.L.H.*, 488 S.W.3d 689, 693 (Mo. App. W.D. 2016) (quoting *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011)). We defer to the trial court's factual findings and credibility determinations to determine whether the decision is supported by substantial competent evidence, and will reverse only if the ruling is clearly erroneous. *Id.* at 693. An alleged Fourth Amendment violation, such as the reasonableness of a public-school search, is a question of law we review *de novo*. *State v. Williams*, 521 S.W.3d 689, 693 (Mo. App. E.D. 2017).

## Analysis

In his first point on appeal, J.M. contends the juvenile court clearly erred in denying his motion to suppress because the search by Academy school officials was unconstitutional. Specifically, J.M. argues that the school administrators' search of his bag violated his Fourth

5

Amendment rights because it was not based upon individualized reasonable suspicion and any consent was not voluntary.[5]

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. By virtue of the Fourteenth Amendment, the Fourth Amendment applies to searches by public-school officials, as they are considered state actors. *Williams*, 521 S.W.3d at 694; *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985).

"[W]hether a public-school official's search of a student is unconstitutional depends on the reasonableness of the search under all circumstances." *Williams*, 521 S.W.3d at 694. While students do not shed their constitutional rights when they enter the schoolhouse, the reasonableness inquiry cannot disregard the school's tutelary responsibility for children, and that securing order in a public-school environment sometimes requires greater control over students than over adults. *Id*. The Supreme Court of the United States has found that "special needs" exist in public school which render Fourth Amendment rights in public schools different from those rights possessed elsewhere. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) ("*Vernonia*"); *Id*. As such, public-school officials are not required to obtain a warrant based on probable cause before a search at their school. *Williams*, 521 S.W.3d at 694.

The Supreme Court has established two different frameworks—one for suspicion-based and one for suspicionless—to analyze reasonableness when a search is conducted by public-school officials. While each framework has a distinct analysis, both require the court to conduct a fact-specific balancing inquiry to weigh the intrusion on the student's Fourth Amendment

---

[5] We find individualized suspicion existed to search J.M's bag; thus we do reach the issue of whether J.M.'s consent was voluntary.

6

privacy interests against the promotion of legitimate government interests. *T.L.O.*, 469 U.S. at 337; *Vernonia*, 515 U.S. at 652–53; *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829 (2002).

A suspicion-based search requires some level of individual suspicion that a student has violated the law or school rules. *See T.L.O.*, 469 U.S. at 345–46; *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373–74, (2009); *Williams*, 521 S.W.3d at 696–99. Conversely, the suspicionless framework recognizes that even absent individualized suspicion, a search could be reasonable and constitutional. *See Vernonia*, 515 U.S. at 656; *Earls,* 536 U.S. 822; *Williams*, 521 S.W.3d at 699–707.

The reasonableness of a suspicion-based search presented in this case requires a twofold inquiry: (1) whether the action was justified at its inception; and (2) whether the search as actually conducted was reasonably related in scope to circumstances which justified interference in the first place. *T.L.O.*, 469 U.S. at 341. The search of a student by a school official is justified at its inception when there are reasonable grounds for suspecting the search will uncover evidence the student has violated or is violating either the law or rules of school. *Id*. at 341–42. The search of student by a school official is considered permissible in its scope when measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the student's gender and the nature of the infraction. *Id*. at 342.

J.M. cites to *State v. Williams*, 521 S.W.3d 695–99 to support his argument that the school officials did not meet the reasonable suspicion threshold to search J.M's bag. We disagree. In *Williams*, the student was subject to a search for being tardy to school, pursuant to the school's policy. *Id.* at 689. Our court noted that "[t]he State presented no evidence that tardy students were more likely to bring contraband into the school. Nor was there evidence that the

7

school officials suspected those students who arrived late to school were in any way involved in the surrounding violence and drug activity." *Id.* at 698. Moreover, the record was devoid of any evidence to suggest that the school had a reasonable basis for suspecting the student was involved in any illicit activity. *Id*. at 698–99. Thus, our court held the State had "failed to elicit any specific, articulable facts to support a reasonable suspicion that Williams was carrying a weapon or drugs, or was engaging in any prohibited activity that would justify searching his person." *Id*. at 699. Unlike *Williams,* J.M. was searched based on his behavior which established a reasonable basis to believe he was involved in illicit activity rather than pursuant to a specific school policy permitting suspicionless or random searches of students. Academy's general search policy was uniformly applied to all students and required the search of a student to be "based on a *reasonable suspicion* that the search will uncover a violation of law or Academy rules." (emphasis added).

We instead apply *T.L.O*., 469 U.S. 325 to the present case. In *T.L.O*., the student was found smoking in the lavatory of the school, which was violation of the school's policy. *Id*. at 328. The student was escorted to the principal's office where she met with the vice principal, who demanded to see the student's purse after she denied smoking. Upon opening the purse, he found a pack of cigarettes and a package of cigarette rolling papers, closely associated with the use of marijuana. As a result, he conducted a more thorough search of the purse, which revealed a small amount of marijuana, a pipe, a substantial quantity of money in dollar bills, and index card with other students' names, and two letters that implicated the student in marijuana dealing. The Supreme Court held the search was not unreasonable. *Id*. at 347.

Similar to the student in *T.L.O*., J.M. violated a school policy, as a suspended student, by remaining on school grounds because he was required to depart Academy grounds after being

8

dismissed at noon.  Although disputed, the record supports school officials repeatedly demanded that J.M. leave Academy's premises, pursuant to Academy's policy.  Additionally, at different times, J.M. was seen by Turner and Palmer trying to communicate with another student inside a classroom.  Like *T.L.O*, Academy school officials found it necessary to intervene, investigate, and search J.M based on his actions.

J.M. argues his unauthorized presence alone did not provide a sufficient basis to satisfy the requisite reasonable suspicion to allow school officials to search a student because he was only "trespassing" which did not support the belief he was engaging in the exchange of drug paraphernalia.  However, his argument ignores the totality of the circumstances. While J.M. could simply been having a conversation with another student in the front entrance, his unauthorized presence on Academy grounds, his repeated refusal to leave when asked to do so, the school officials' observations he was signaling with another student from the front entrance, and his current suspension for possession of drug paraphernalia, collectively gave rise to the reasonable suspicion, which warranted the search.  The administration was not acting on a mere "hunch."  Rather, this search was premised upon "the sort of 'common-sense conclusio[n] about human behavior'" upon which school officials are entitled to rely.  *Id*. at 346.  "[T]he requirement of reasonable suspicion is not a requirement of absolute certainty; sufficient probability, not certainty, is the touchstone of reasonableness under Fourth Amendment." *Id*. (inner quotations omitted). Therefore, the search by the school officials was justified at its inception because there were reasonable grounds for suspecting the search would turn up evidence that J.M. violated or was violating either the law or the rules of the school.

Finally, the search of J.M.'s bag was reasonably related in its scope to the circumstances justifying it in the first place, as it was no greater than necessary to satisfy Academy's interest in

the underlying need for the search of potential wrong doing. The record does not show school officials conducted a strip-search or pat-down of his person. The search was limited solely to his bag. As such, the search was minimally intrusive and did not exceed the reasonableness that a guardian and tutor might undertake. *See Vernonia*, 515 U.S. at 665.

In conclusion, we strongly emphasize there is a special need for an immediate response to any behavior indicative of a threat to either the safety of school's children and teachers or the educational process, which justifies only reasonable suspicion for a search in a school. *See T.L.O.*, 469 U.S. at 376 n. 15. Consequently, Academy's officials did not have to wait until they witnessed anything more or witnessed J.M. in the commission of a specific act of wrong doing. As such, when individualized suspicion is present, the search of a student is reasonable and justified, especially given the significant—potentially tragic—threat a weapon poses to the safety of a school's children and teachers. Point one is denied.

In his second point, J.M. argues the juvenile court abused its discretion in sustaining the Juvenile Officer's objection to J.M.'s offer of proof because the endorsement of J.J. as a witness was only five days late. J.M. contends he was prejudiced because J.J's testimony was relevant and material to J.M.'s defense.

### Standard of Review

When a party fails to comply with an applicable discovery rule, a trial court has the discretion to order disclosure of the evidence, grant a mistrial, grant a continuance, exclude such evidence, or enter such other orders it deems just under the circumstances of the case. *State v. Smith*, 491 S.W.3d 286, 297 (Mo. App. E.D. 2016). In reviewing a trial court's ruling regarding the admission or exclusion of evidence, we presume the trial court's ruling is correct, as the court has discretion to weigh the probative value of evidence against its prejudicial effect. *Bell v.*

10

*Redjal*, 569 S.W.3d 70, 96 (Mo. E.D. App. 2019). "We review the trial court's admission or exclusion of evidence for prejudice and not mere error, and will affirm the court's ruling unless it was so prejudicial that it deprived the defendant of a fair trial." *State v. Garvey*, 328 S.W.3d 408, 417 (Mo. App. E.D. 2010).

"A trial court enjoys broad discretion to allow late endorsement of witnesses." *Melillo v. State*, 380 S.W.3d 617, 624 (Mo. App. S.D. 2012). However, a court does not abuse its discretion when it "refuses to allow the late endorsement of a defense witness whose testimony would have been cumulative, collateral, or if the late endorsement would have unfairly surprised the State." *State v. Hillman*, 417 S.W.3d 239, 246 (Mo. banc 2013). The exclusion of witnesses may be appropriate if there is no reasonable justification for the failure to disclose, but would likely be an abuse of discretion if the explanation tended to show good cause for the nondisclosure. *Id*.

### *Analysis*

Rule 25.05(a)(2) requires a defendant to disclose to the State "[t]he names and last known addresses of persons, other than defendant, whom defendant intends to call as witnesses at any hearing or trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements[.]"[6]

In the present case, the Juvenile Officer filed a written request for disclosure from J.M. on Monday, September 10, 2018, which was due September 24, 2018, pursuant to Rules 110.03 and 25.02(b). On Saturday, September 29, 2018, J.M. filed the endorsement of the witness, which was five days after it was due and two days prior to the Monday trial. The record demonstrates an offer of proof was made regarding J.J.'s testimony, which mirrored that of J.M.

---

[6] All references to Rules are to Missouri Supreme Court Rules (2018).

11

J.M. argues our court has affirmed cases where lower courts allowed the endorsement of a witnesses as late as the eve of trial. However, J.M. concedes in his appellate brief, that the record is undisputed that J.J. was at the school with J.M. The record is filled with references to J.J.; therefore, J.M. knew of J.J.'s existence as a potential witness and had amble opportunity to endorse J.J. long before Saturday, September 29, 2018. Even if the witness could not be located, counsel was aware of this witness and should have provided this information to the State before September 29, 2018. *See State v. Bowman*, 783 S.W.2d 506, 507 (Mo. App. E.D. 1990); *see also State v. Duncan*, 385 S.W.3d 505, 509 (Mo. App. S.D. 2012) (holding that the trial court did not abuse its discretion in denying appellant's request to endorse witness on the morning of the jury trial). *State v. Cox*, 248 S.W.3d 720, 723 (Mo. App. S.D. 2008) (explaining that the fact that appellant was unable to locate witness did not preclude him from endorsing her as a witness.). J.M. did not provide any reasonable justification for the failure to disclose J.J. as a witness, so exclusion of his testimony was not error. *See State v. Martin*, 103 S.W.3d 255, 261 (Mo. App. W.D. 2003) (finding that the exclusion of testimony may be proper when there is no reasonable justification for the failure to disclose the witness).

Moreover, J.J.'s testimony, if allowed into evidence, would have been cumulative of the evidence presented by the defense. *See Hillman*, 417 S.W.3d 239, 246. Point two is denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____

Lisa P. Page, Judge

Philip M. Hess, P.J. and Kurt S. Odenwald, J., concur.

12