**[Cite as *In re K.P.*, 2025-Ohio-4728.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                    :

[K.P.,                               :          Nos. 24AP-549
                                                and 25AP-350
                   Appellant].       :        (C.P.C. No. 23JU-5749)

                                     :          (ACCELERATED CALENDAR)

                                     :

---

D E C I S I O N

Rendered on October 14, 2025

---

**On brief**: [*Shayla D. Favor*], Prosecuting Attorney, *Seth L. Gilbert*, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh.*

**On brief**: *Furniss & Stewart Law, LLC*, and *Dru Toon*, for appellant. **Argued:** *Dru Toon.*

---

APPEALS from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

EDELSTEIN, J.

{¶ 1}  Appellant, K.P., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating him a delinquent minor for the illegal conveyance or possession of a deadly weapon in a school safety zone.  For the reasons that follow, we affirm.

## I.  FACTS AND PROCEDURAL OVERVIEW

{¶ 2}  On February 21, 2023, Central High School security resource officer Paul-Michael Northcutt ("SRO Northcutt") discovered a firearm on the person of K.P. while conducting a standard security check of students entering the school.  (Dec. 4, 2023 Hearing Tr. at 6.)  At that time, K.P. was a 17-year-old student.

{¶ 3}  On May 30, 2023, plaintiff-appellee, the State of Ohio, filed a complaint alleging that K.P. was delinquent for committing one count of carrying a concealed weapon

in violation of R.C. 2923.12(A)(2) and two counts of illegal conveyance or possession of a deadly weapon in a school safety zone in violation of R.C. 2923.122. K.P. denied the charges and the juvenile court referred the case to a magistrate pursuant to Juv.R. 40.

{¶ 4} K.P. moved to suppress the evidence found on his person and statements he made to school officials about the firearm that, he argued, were tainted by the allegedly unlawful pat-down search. On December 4, 2023, the trial court magistrate conducted a hearing on K.P.'s motion. At that hearing, SRO Northcutt, who is not a police officer, testified that his job is to ensure student safety. (Hearing Tr. at 7-9.) Among other things, SRO Northcutt enforces Central High School's safety policies and procedures for students entering and exiting the building.

{¶ 5} At all relevant times, Central High School had a written policy for daily weapons searches in order to protect students and staff. As part of the school's entry procedure, all students walked through a security checkpoint that included a bag check and metal detection screening. Parents and students, including K.P. and his parents, were given notice of this policy at the beginning of each school year in the student handbook and at orientation.

{¶ 6} Because the school's metal detector was inoperable, SRO Northcutt used a hand-held metal detector wand on each student when they entered the school. (Hearing Tr. at 13-16.) SRO Northcutt testified he was trained to simultaneously pat down each student while performing the hand-held wand scan. (*See* Hearing Tr. at 15-16, 24-25, 32-33, 56, 59-62.) If the wand alerted, SRO Northcutt would ask the student to empty their pockets or, where appropriate, pull the student aside for further investigation. (*See* Hearing Tr. at 15, 20, 23.)

{¶ 7} On February 21, 2023, SRO Northcutt discovered a firearm in K.P.'s waistband while performing a hand-held wand scan and pat down of his person as part of the school's standard entry procedure. SRO Northcutt testified his standard practice was to pat down ***all*** students—irrespective of whether the hand-held wand scan alerted—and admitted that he discovered the firearm in K.P.'s waistband from the pat-down search. (*See* Hearing Tr. at 20, 32-33, 35, 39, 55-62.) Pursuant to school policy, SRO Northcutt reported the incident to police and turned over the recovered firearm to responding officers.

{¶ 8} On December 15, 2023, via video teleconference, the trial court magistrate orally denied K.P.'s motion to suppress. Of note, the record before us does not contain a

transcript of the December 15, 2023 proceeding as it was not requested by K.P. On January 4, 2024, the trial court entered a judgment adopting the magistrate's decision denying K.P.'s motion to suppress.

{¶ 9} The matter proceeded to adjudication on January 24, 2024. At that hearing, K.P. stipulated to the state's factual recitation as to the illegal conveyance of a deadly weapon in a school zone, as charged in Count 2 of the complaint. The state moved to dismiss the remaining two counts. Based on the stipulated facts, the magistrate found the state proved, beyond a reasonable doubt, that K.P. committed illegal conveyance of a deadly weapon in a school zone and should be adjudicated as a delinquent minor. The magistrate also dismissed Counts 1 and 3, pursuant to the state's motion. On February 22, 2024, the magistrate issued a decision, signed by both the magistrate and the trial court judge, memorializing the magistrate's adjudicatory findings.[1]

{¶ 10} K.P. timely filed his objections to the magistrate's decision concerning the motion to suppress and adjudication. Specifically, K.P. asserted the magistrate erred in (1) "finding that no Fourth Amendment violation occurred during the school security officer's seizure and/or search of [K.P.]'s person," and (2) "not suppressing the evidence that resulted from the unconstitutional seizure and/or search." (Feb. 23, 2024 Objs. to Mag.'s Decision.) K.P. did not otherwise challenge the propriety of the magistrate's adjudication.

{¶ 11} On February 27, 2024, the magistrate issued written findings of fact and conclusions of law supporting its decision denying K.P.'s motion to suppress. Finding that K.P. had a "diminished expectation of privacy in the public school environment" and that the school had an "overriding, compelling governmental interest in maintaining the safety of public school students," the magistrate ultimately found that the "wand and tap search" of K.P. "was justified at its inception, reasonable, furthered [the school]'s compelling interest in ensuring students' safety from physical harm and, thus, did not violate the Fourth Amendment." (Feb. 27, 2024 Findings of Fact & Conclusions of Law at 2-3.)

---

[1] Paragraph four of the magistrate's February 22, 2024 decision erroneously stated that K.P. entered an admission to the illegal conveyance of deadly weapons in a school safety zone offense. Pursuant to Civ.R. 60(A), following this court's remand of the matter, the magistrate corrected that error by deleting the erroneous language and replacing it with the following: "Based upon testimony previously provided and the stipulation of facts provided, the Magistrate finds [K.P.] to be a delinquent minor having committed" Count 2 of the complaint. (*See* Mar. 21, 2025 Jgmt. Entry & Mag.'s Decision.)

{¶ 12} After the requested transcripts were filed and the magistrate's written decision was issued, K.P. filed supplemental objections to the magistrate's decision denying his motion to suppress. Specifically, he contended that the magistrate erred in concluding SRO Northcutt's "tap search" was justified at its inception under *N.J. v. T.L.O.*, 469 U.S. 325 (1985), and *State v. Polk*, 2017-Ohio-2735, as discussed more below.

{¶ 13} On June 27, 2024, the trial court conducted a hearing on K.P.'s objections. However, the record before us does not contain a transcript of the June 27, 2024 proceedings.

{¶ 14} On August 2, 2024, the trial court issued a decision and judgment entry overruling K.P.'s objections to the magistrate's decision denying his suppression motion and adjudication. The court stated its decision on its independent assessment of the evidence and oral arguments presented by both parties at the June 2024 hearing. On October 4, 2024, the court entered disposition.

{¶ 15} K.P. appeals from that judgment, assigning the following error for our review:

> JUVENILE MAGISTRATE JEANNE NEWKIRK (HEREINAFTER "THE JUVENILE MAGISTRATE") ERRED WHEN SHE OVERRULED [K.P.'S] MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF AN UNLAWFUL SEARCH OF [K.P.]. JUDGE JAMES BROWN (HEREINAFTER "THE JUVENILE JUDGE") ALSO ERRED WHEN HE MADE ERRONEOUS FINDINGS OF FACT AND CONCLUSIONS OF LAW IN HOLDING THAT THE JUVENILE MAGISTRATE MADE "NO ERROR OF LAW OR FACT" IN HER DECISION.

## II. LEGAL ANALYSIS

{¶ 16} In his sole assignment of error, K.P. challenges the constitutionality of SRO Northcutt's warrantless search of his person based on the school's policy authorizing SRO Northcutt to pat down each student while performing a hand-held wand scan on all students entering the school. He argues that because SRO Northcutt lacked a valid justification to conduct a pat-down search, the trial court erred in adopting the magistrate's decision denying his motion to suppress the firearm obtained as a fruit of the unlawful search of his person under the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution.

### A.  Standard of Review

{¶ 17} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 14, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8.  Thus, an appellate court's standard of review of a trial court's decision denying a motion to suppress is two-fold.  *See, e.g., State v. Pilgrim*, 2009-Ohio-5357, ¶ 13 (10th Dist.), citing *State v. Reedy*, 2006-Ohio-1212, ¶ 5 (10th Dist.), citing *State v. Lloyd*, 126 Ohio App.3d 95, 100-01 (7th Dist. 1998).

{¶ 18}  In ruling on a motion to suppress, the trial court first assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses.  *See, e.g., State v. Leak*, 2016-Ohio-154, ¶ 12, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992).  Thus, on appeal, we must " 'accept the trial court's findings of fact if they are supported by competent, credible evidence.' "  *Leak* at ¶ 12, quoting *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982).

{¶ 19}  With respect to the trial court's conclusions of law, however, our standard of review is de novo.  *See, e.g., Banks-Harvey* at ¶ 14, citing *Burnside* at ¶ 8; *State v. Turner*, 2020-Ohio-6773, ¶ 14.  *See also Pilgrim* at ¶ 13.  We are tasked with independently determining whether the facts satisfy the applicable legal standard.  *See id.*

{¶ 20}  Upon a motion to suppress evidence obtained without a warrant, the state carries the burden of showing, by at least a preponderance of the evidence, that the challenged search and/or seizure fits within one of the defined exceptions to the Fourth Amendment's warrant requirement.  *See, e.g., Xenia v. Wallace,* 37 Ohio St.3d 216, 218 (1988), citing *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978); *Columbus v. Ellyson*, 2006-Ohio-2075, ¶ 5 (10th Dist.), citing *Athens v. Wolf*, 38 Ohio St.2d 237, 241 (1974).

### B.  Fourth Amendment in Public Schools

{¶ 21} The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures.  *See, e.g., Banks-Harvey*, 2018-Ohio-201, at ¶ 17, citing *United States v. Ross*, 456 U.S. 798, 825 (1982).  It is a restraint on the government and, more narrowly here, law enforcement. *See id.*  By virtue of the Fourteenth Amendment, the Fourth Amendment applies to searches by public school officials, as they are considered state actors.  *T.L.O.*, 469 U.S. at 334, citing *Elkins v. United States*, 364 U.S. 206, 213 (1960).

{¶ 22} "[T]he touchstone of the constitutionality of a governmental search" is "reasonableness." *Bd. of Edn. of Indep. School Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 828 (2002) ("*Earls*"). "For a search or seizure to be reasonable under the Fourth Amendment, it must be based upon probable cause and executed pursuant to a warrant." *State v. Moore*, 90 Ohio St.3d 47, 49 (2000). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." (Emphasis in original.) (Footnotes omitted.) *Katz v. United States*, 389 U.S. 347, 357 (1967). Therefore, "[a] search is unreasonable when police lack a valid warrant and no exception to the warrant requirement applies." *State v. Jackson*, 2022-Ohio-4365, ¶ 10, citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

{¶ 23} Ordinarily, a "reasonable" search under the Fourth Amendment must be based on individualized suspicion of wrongdoing. *Polk*, 2017-Ohio-2735, at ¶ 12, citing *Chandler v. Miller*, 520 U.S. 305, 313 (1997), citing *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995) ("*Vernonia*"). However, the Supreme Court of the United States has recognized that " 'particularized exceptions to the main rule are sometimes warranted based on "special needs, beyond the normal need for law enforcement." ' " *Polk* at ¶ 12, quoting *Chandler* at 313-14, quoting *Skinner v. Ry. Labor Executives' Assn.*, 489 U.S. 602, 619 (1989).

{¶ 24} While students "do not shed their constitutional rights when they enter the schoolhouse," *Earls* at 829, citing *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506 (1969), it is well-established that " 'special needs' inhere in the public school context." *Earls* at 829, citing *Vernonia* at 653, and *T.L.O.*, 469 U.S. at 339-40. As such, "Fourth Amendment rights . . . are different in public schools than elsewhere" because a court's inquiry into the reasonableness of a warrantless search or seizure must include the consideration of " 'the schools' custodial and tutelary responsibility for children.' " *Earls* at 829-30, quoting *Vernonia* at 656. For that reason, the Supreme Court of the United States has maintained that public schools fall under a "special needs" category that exempts them from warrant and probable-cause requirements typically associated with searches conducted by state actors. *See, e.g.*, *Vernonia* at 653.

{¶ 25} The court has established two related, yet distinct, standards to determine whether a public-school search is reasonable, and therefore constitutional: one for searches

based on individualized suspicion and one for suspicionless searches based on administrative policy. In determining whether a public-school search is reasonable under either framework, courts must engage in a fact-specific balancing inquiry in which they weigh the intrusion on the student's Fourth Amendment privacy interests against the promotion of legitimate government interests. *T.L.O.* at 337; *Vernonia* at 652-53; *Earls*, 536 U.S. at 829.

{¶ 26} The first framework applies when the search is based on some level of individualized suspicion that a student has violated the law or school rules. *See T.L.O.*, 469 U.S. at 345-46 (search of student's purse after a teacher caught the student smoking in violation of school rules); *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364, 373-74 (2009) (strip search of student based on suspicion that she was distributing contraband). Under this "individualized suspicion" framework, the reasonableness of a search "involves a twofold inquiry": (1) whether the action was " 'justified at its inception' "; and (2) whether the search as actually conducted was " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *T.L.O.*, 469 U.S. at 341, quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Ordinarily, a search is justified at inception when "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341-42. And a search is permissible in scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. There must exist some nexus between the item searched for and the suspected violation. *Id.* at 345.

{¶ 27} The second framework applies for analyzing the reasonableness of administrative searches conducted by public school officials in the absence of individualized suspicion. Under this framework, courts must weigh the importance of the government's interest and the efficacy of the search in meeting that interest against the nature of the privacy interest involved and the intrusiveness of the search. *See, e.g.*, *Vernonia*, 515 U.S. at 653; *Polk*, 2017-Ohio-2735, at ¶ 24-39; *Earls*, 536 U.S. at 830-34. Three factors guide this analysis: (1) "the nature of the privacy interest allegedly compromised"; (2) "the character of the intrusion imposed"; and (3) "the nature and immediacy of the government's concerns and the efficacy of the [p]olicy in meeting them."

*Earls* at 830-38. *See also Vernonia* at 654-64. Thus, even absent individualized suspicion, a search may pass constitutional muster under this broad balancing test.

{¶ 28} Pursuant to the exclusionary rule established by the Supreme Court of the United States, evidence obtained as the result of an unlawful search or seizure must be excluded at trial as " 'fruit of the poisonous tree.' " *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *State v. Farris*, 2006-Ohio-3255, ¶ 49. *See also Banks-Harvey*, 2018-Ohio-201, at ¶ 25; *Davis v. United States*, 564 U.S. 229, 236 (2011), quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960).

### C. Analysis

{¶ 29} In the case at bar, there was no individualized suspicion that led SRO Northcutt to search K.P.'s person. Rather, SRO Northcutt admitted his pat-down search of K.P. was conducted as part of the standardized screening process he uses for ***all*** students— not out of individualized suspicion that K.P. was carrying contraband or otherwise violating the law or school rules. (*See* Hearing Tr. at 39-40.) Thus, this search falls within the general category of "administrative searches," as it was conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of an investigation to secure evidence of a crime or violation of a school rule. *See, e.g., Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 537 (1967). Accordingly, the "individualized suspicion" framework set forth in *T.L.O.* has no bearing on our analysis of the constitutionality of the pat-down search conducted in this case. This is particularly true since SRO Northcutt testified about ***feeling*** the firearm on K.P.'s person ***before*** he waved the hand-held metal detector wand across the front waistband of K.P.'s pants. (*See* Hearing Tr. at 62.)

{¶ 30} As such, we must apply the standard set out in *Vernonia* and *Earls* to the search conducted in this case to determine if it was reasonable and, therefore, constitutional, or if the search violated K.P.'s Fourth Amendment rights. *See, e.g., Doe v. Little Rock School Dist.*, 380 F.3d 349, 354-57 (8th Cir. 2004) (upholding warrantless searches of students' belongings, without individualized suspicion, in randomly selected classrooms under school policy); *Polk*, 2017-Ohio-2735 (upholding warrantless search of an unattended bookbag without individualized suspicion); *In re Latasha W.*, 60 Cal.App.4th 1524 (Jan. 27, 1998) (upholding school policy permitting random metal detector weapons searches of high school students).

{¶ 31} Initially, we note that K.P. does not challenge on appeal the propriety of Central High School's security protocol subjecting all students to metal detector searches upon their arrival to school each morning. (*See* Appellant's Brief at 22.) Indeed, because "[s]chools have an obligation to keep their students safe," the need of schools to keep weapons off campus is substantial. *See, e.g., Polk* at ¶ 25, citing *Earls*, 536 U.S. at 830. Guns and knives pose a threat of death or serious injury to students and staff. *See Polk* at ¶ 25. Thus, as K.P. seems to concede, Central High School's protocol generally supports the compelling governmental interest in public school safety by helping to ensure the contents of students' bags and what they carry on their persons are not dangerous and that students, teachers, and faculty are safe from physical harm. *See, e.g., Polk* at ¶ 26.

{¶ 32} Rather, at issue in this case is SRO Northcutt's practice of scanning students with a hand-held metal detector wand while simultaneously patting them down ***irrespective*** of whether the metal detector activates on the student's person. Of course, once a metal detector activates on a student's person and the metal that activated the scanning device cannot reasonably be determined, a pat-down search of the student's person would be reasonable under *T.L.O.* However, as the state acknowledges, if this case involved something a metal detector could not find—drugs, for instance—we would have more serious concerns about the constitutionality of SRO Northcutt's conduct.

{¶ 33} K.P. had a legitimate privacy interest in his person, although a lesser one than that of people generally in public situations. *See Vernonia*, 515 U.S. at 656-57; *Little Rock School Dist.*, 380 F.3d at 353 ("[P]ublic school students have traditionally been treated as presumptively responsible persons entitled to some modicum of privacy in their personal belongings, at least to the extent that recognition of such privacy interests does not unduly burden the maintenance of security and order in schools."). Indeed, unlike the "negligible" intrusions in *Vernonia* and *Earls* (which involved drug testing of student participants in voluntary competitive extracurricular activities), a search of a student's person—or even a closed purse or other bag carried on their person (though not at issue here)—just like a similar search carried out on an adult, is undoubtedly a serious violation of a person's subjective expectation of privacy. *See, e.g., Vernonia* at 658; *Earls*, 536 U.S. 822, at syllabus; *State v. Williams*, 521 S.W.3d 689, 705 (Mo.App. 2017).

{¶ 34} Students often carry personal items—for instance, necessary medications, menstrual products, or additional clothing for after-school activities—in their pockets and

bags. And, regardless of whether they are carrying contraband, students can easily feel embarrassed, uncomfortable, and alienated when school officials rifle through their belongings or touch them in private areas, particularly in front of their peers. *See, e.g.*, Jason P. Nance, *Random, Suspicionless Searches of Students' Belongings: A Legal, Empirical, and Normative Analysis*, 84 U. COLO. L. REV. 367, 395-96 (2013); Michael A. Sprow, *The High Price of Safety: May Public Schools Institute a Policy of Frisking Students as They Enter the Building?*, 54 BAYLOR L. REV. 133, 161 (2002). As described by SRO Northcutt, the manner in which he has implemented Central High School's policy raises serious concerns about potential unlawful encroachments upon students' privacy interests. *See, e.g., Little Rock School Dist.*, 380 F.3d at 355 ("Full-scale searches that involve people rummaging through personal belongings concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs."). The physical touching of apparently **all** students at Central High School **each day** "exacerbates the intrusive nature of the search." *Williams* at 705.

{¶ 35} Another factor we consider in determining the intrusiveness of a search is the purpose for which school officials use the fruit of the searches. In *Earls* and *Vernonia*, students' positive drug test results were never disclosed to law enforcement; the most serious form of discipline that could result was a student's exclusion from extracurricular activities. *See Earls*, 536 U.S. at 833-34; *Vernonia*, 515 U.S. at 651. In stark contrast, the fruits of the searches at issue here are apparently turned over to law enforcement officials and used in criminal proceedings against students like K.P. (*See* Hearing Tr. at 28.) Because Central High School's searches can lead directly to the imposition of punitive criminal sanctions, the character of the intrusions is qualitatively more severe than that in *Vernonia* and *Earls*. Indeed, SRO Northcutt's pat-down search of K.P. led to the discovery of a firearm, which immediately resulted in a call to police who subsequently charged K.P. as a juvenile with three felony offenses.

{¶ 36} "A sliding scale is used in evaluating the reasonableness of a search, that is, the government is entitled to inflict more serious intrusions upon legitimate expectations of privacy as the governmental interest served by the intrusions becomes more compelling." *Little Rock School Dist.* at 355. "A governmental interest need not meet some 'fixed, minimum quantum of governmental concern,' but merely has to be '*important enough* to

justify the particular search at hand,' considering the degree of its intrusiveness." (Emphasis in original.) *Id.*, quoting *Vernonia* at 661.

{¶ 37} Here, the record before us indicates the school's purpose for its search policy is to protect its students, teachers, and staff. And we recognize the legitimate and important nature of the interest in keeping guns, drugs, and other contraband out of schools. *See, e.g., Boim v. Fulton Cty. School. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) (noting the "climate of increasing school violence and government oversight," and that schools have an "[i]ndisputably compelling interest in acting quickly to prevent violence on school property"); *Stockton v. Freeport*, 147 F.Supp.2d 642, 646 (S.D. Tex. 2001) ("It is difficult to conceive of a scenario in which a greater governmental interest is invoked than the threat of indiscriminate violence at school"); *In re F.B.*, 555 Pa. 661, 673 (1999) (finding schools "are simply not required to wait for a tragedy to occur within their walls to demonstrate that the need is immediate"). With weapons—particularly, firearms—being notoriously problematic for all schools because they pose a constant and grave threat to the safety and well-being of every person on school premises, it is axiomatic that the interest of safety in public schools in this respect is compelling.[2]

{¶ 38} Still, we believe it prudent to emphasize that students retain an expectation of privacy in their bodies and in their personal belongings at school. *See, e.g., Vernonia*, 515 U.S. at 655-56; *Williams*, 521 S.W.3d at 708 (holding the hand-search of a student's person because he was tardy for school, which resulted in the discovery of drugs in the student's pocket, violated the student's Fourth Amendment rights). School policies subjecting all students to searches using metal detectors or drug-sniffing dogs are minimally invasive and may provide an effective means for producing the individualized suspicion necessary for more intrusive searches, where indicated. *See, e.g., Doran v. Contoocook Valley School Dist.*, 616 F.Supp.2d 184, 192-93 (D.N.H. 2009) (holding public school's use of drug dogs to sniff the school grounds and students' personal property did not violate Fourth Amendment); *Latasha W.*, 60 Cal.App.4th, at 1526-28 (holding random metal detector weapon searches of public school students did not violate Fourth

---

[2] As of September 23, 2025, data from organizations including the Gun Violence Archive, Everytown, and Education Week indicates there had been 53 school shootings in the United States since the beginning of 2025. *See* Alex Leeds Matthews, Amy O'Kruk, and Annette Choi, *School Shootings in the US: Fast Facts*, CNN (Sept. 24, 2025), https://www.cnn.com/us/school-shootings-fast-facts-dg (accessed Oct. 13, 2025) [https://perma.cc/C3YC-XLQY].

Amendment). *But see In the Interest of L.E.*, 589 S.W.3d 593, 602 (Mo. App. 2019) (observing that "while less-invasive means of searching may exist," the standard established by *Vernonia* and *Earls* requires courts "to examine 'the character of the intrusion imposed'—not potential alternatives—as one of three factors in the balancing analysis"). Put into practice, a minimally intrusive, suspicionless dog or metal-detector search (whose reasonableness would be analyzed under *Vernonia/Earls*) may produce reasonable suspicion to perform a more invasive search of a student or the student's belongings (analyzed under *T.L.O.*).

{¶ 39} Given the facts of this case, we have serious concerns about the manner in which Central High School's screening policy was implemented by SRO Northcutt. Although we recall the inoperable status of the school's metal detector and certainly recognize the financial constraints that may limit Central High School's ability to fix or replace it, we do not believe these circumstances are relevant to evaluating the reasonableness of the school's screening policy when applying the *Vernonia/Earls* standard.

{¶ 40} However, even assuming, as SRO Northcutt testified, that SRO Northcutt patted down K.P.'s waistband and felt the firearm ***before*** scanning that area with the metal detector wand (*see* Hearing Tr. at 62), we find discovery of the firearm was inevitable based on the circumstances presented here.

{¶ 41} Under the inevitable discovery doctrine, evidence obtained unconstitutionally is admissible if it "would have been ultimately or inevitably discovered during the course of a lawful investigation." *State v. Perkins*, 18 Ohio St.3d 193, 196 (1985), applying *Nix v. Williams*, 467 U.S. 431, 444 (1984) (holding that if evidence unconstitutionally obtained "ultimately or inevitably would have been discovered by lawful means," it is admissible). The burden is on the prosecution to demonstrate, within a reasonable probability, that the evidence would have been discovered independent from the unlawful conduct. *See, e.g., State v. Ewing*, 2010-Ohio-1385, ¶ 26 (10th Dist.), citing *State v. Coston*, 2006-Ohio-3961, ¶ 17 (10th Dist.), citing *Perkins* at 196.

{¶ 42} On review of the record, we find the state has satisfied its burden here. Had SRO Northcutt scanned K.P.'s waistband with the hand-held metal detector wand ***before*** he patted him down, the device would have alerted to the presence of metal from the recovered firearm in that area. To that end, there is no dispute the hand-held metal detector

wand was working on February 21, 2023, as SRO Northcutt testified about it vibrating on the zipper of the hoodie K.P. was wearing just before the firearm was discovered. (*See* Hearing Tr. at 34-35, 61.) Once the hand-held metal detector wand alerted to the presence of metal in the front waistband area of K.P.'s person—and nothing in the record before us suggests it would not have alerted to the presence of a firearm in that area—SRO Northcutt would have been duty-bound to direct the removal of any remaining metal objects and, where appropriate, conduct a search of K.P.'s person in order to find the metal that activated the device.

{¶ 43} For these reasons, we conclude that the evidence K.P. sought to suppress was admissible under the inevitable discovery doctrine. Because this is the same result the trial court reached, albeit for a different reason, we overrule K.P.'s sole assignment of error.

## III. CONCLUSION

{¶ 44} Having overruled K.P.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

JAMISON, P.J., and BOGGS, J., concur.